ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Meltech Corporation, Inc. | )     ASBCA No. 61871 |
| | ) |
| Under Contract No. W912DR-14-D-0021 | ) |

APPEARANCES FOR THE APPELLANT:     Leonard A. Sacks, Esq.
    Leonard A. Sacks & Associates, P.C.
    Rockville, MD
    Fred A. Mendicino, Esq.
    Faughnan Mendicino PLLC
    Dulles, VA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
    Adam J. Kwiatkowski, Esq.
    Engineer Trial Attorney
    U.S. Army Engineer District, Baltimore

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

This appeal arises from a contract between Meltech Corporation, Inc. ("Meltech" or "appellant"), and the U.S. Army Corps of Engineers ("USACE" or "government"), specifically a Multiple Award Task Order contract that included both Design-Build and Design-Bid-Build construction projects within the Baltimore District Area of Responsibility, and the September 30, 2014, award by USACE of a Firm-Fixed-Price Task Order No. 0002 to Meltech for all costs in connection with the renovation, design, and construction of Building 8609, located at Ft. Meade, MD. This appeal is related to fifteen total appeals that were consolidated.[1] This appeal involves Meltech's challenge to the government credit taken on the 24-gauge panels for the metal roof.

---

[1] ASBCA Nos. 61694, 61706, 61762, 61763, 61764, 61765, 61766, 61767, 61768, 61869, 61870, 61871, 61872, 62091, 62987. The lead appeal is ASBCA No. 61694. Thirteen appeals were heard by the Board, and two appeals were resolved on summary judgment. On December 17, 2021, a decision on summary judgment was issued in ASBCA Nos. 61706 and 61768. On July 16, 2025, a decision was issued in ASBCA Nos. 61766, 61767 and 61872. On January 6, 2026, a decision was issued in ASBCA No. 61765. On January 16, 2026, a decision was issued in ASBCA Nos. 61762 and 61764. Familiarity with those decisions is presumed.

The Board has jurisdiction over these appeals under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109.  A nine-day hearing was held via videoconference. For the reasons stated below, we deny the appeal.

FINDINGS OF FACT

*Contract and Task Order*

1.  On June 10, 2014, USACE issued a Request for Proposals (RFP) for a Multiple Award Task Order Contract (MATOC) that included design-build and design-bid-build construction projects within the Baltimore District area of Responsibility. This was Phase 1 of a two-phase construction procurement.  (Joint Stipulations of Fact, General Background (JSOF GB) ¶ 1; R4, tab 2)

2.  The MATOC included renovating several similar dormitory buildings at Fort Meade, including Building 8609 (JSOF GB ¶ 3).

3.  On August 14, 2014, USACE issued Amendment 0003 to RFP W912DR-14-R-0003 for two seed projects under the MATOC to provide Design Criteria for the Design-Build renovation of Building 8609 at Fort Meade and Building 4501 at Aberdeen Proving Ground.  Each task order was to be awarded separately.  (JSOF GB ¶ 7)

4.  On September 15, 2014, Meltech submitted its technical and cost proposals for Building 8609's renovation.  Meltech's proposal included a preliminary schedule. According to this schedule, the design period would begin on November 18, 2014, and end on June 4, 2015.  The construction period would begin on May 29, 2015, and end on April 26, 2016.  (JSOF GB ¶¶ 11, 12)

5.  On September 29, 2014, USACE awarded Meltech Base Contract No. W912DR-14-D-0021.  On September 30, 2014, USACE awarded Task Order Contract No. 0002 to Meltech for the renovation of Building 8609 at Fort Meade.  The Task Order Contract provided Meltech with a 540-calendar day performance period beginning from the Notice to Proceed date.  The Notice to Proceed was issued on November 17, 2014, and the original completion date was May 10, 2016.  (JSOF GB ¶¶ 13-16)

*Design Criteria*

6.  The Design Criteria, under Applicable Criteria, Section 4.0, lists nearly 300 "starting criteria for the RFP," and that "these publications reference other codes, standards or manuals that may be of assistance to the designers and where applicable

2

should be assumed to be all inclusive in the development of the design" (R4, tab 3 at 30). Included in the standards were National Roofing Contractors Association (Roofing and Waterproofing Manual), Installation Design Guides (Fort Meade Installation Design Guide; Army Installation Design Standards), and Minimum Design Loads for Buildings and Other Structures (American Society of Civil Engineers) (R4, tab 3 at 31, 33, 35).

7. The Design Criteria provided that the building's roof design shall take into consideration live loads and wind loads (Unified Facilities Criteria (UFC), Structural Engineering 3-301-01, Table D-1; Table E-1) (R4, tab 3 at 55, 104). The structural design of the roof stated "[c]alculations, including computer analyses, shall be furnished for all principal roof" and that "[s]ufficient documentation shall be provided to interpret input and output" (R4, tab 3 at 104).

8. The Design Criteria, under General Technical Requirements, Building Exterior, 5.3.4, required roof panels for the new gabled roof but did not specify the gauge (thickness)[2] of the panel (Joint Stipulations of Fact, ASBCA No. 61871, hereinafter (JSOF) ¶ 1; R4, tab 3 at 41).

*The Processes for Providing Design Submittals and Deviating from the Accepted Design*

9. The Design Criteria required four distinct design submittals: 30% (Concept Submittal), 50% (Preliminary Design Review Submittal), 95% (Final), and 100% (Design Complete) (R4, tab 3 at 99, 109, 110, 116-17). The 100% Design Complete Submittal describes that "[a]fter the Final Design Review, the Contractor shall revise the Contract Documents by incorporating any comments generated during the Final Design Review and shall prepare final hard copy Contract Specifications" (R4, tab 3 at 116-17). The Design Criteria states that USACE's "review will be for conformance with the contract [Design Criteria]" (R4, tab 3 at 94).

10. The Design Criteria, under Section 01 12 00, Design After Award, subsection 1.3, Deviating from the Accepted Design, states that changes from the approved design will require government concurrence and modification (R4, tab 3 at 92).

---

[2] The "gauge" of steel refers to its thickness, with smaller numbers being thicker and larger numbers being thinner (JSOF ¶ 2).

*Meltech's Roof Submittals*

11. Meltech's price estimate for its proposal assumed that the metal panels that would be used to construct the gable roofs would be made of 22-gauge steel (JSOF ¶ 3; R4, tab 287 at 15).

12. Meltech's Design Complete (100%) Submittal Specifications dated February 24, 2016, under the Description of Metal Roof System, Section 1.2, lists the performance standards which the roof "panels and accessory components must conform to," including standards for carbon steel sheets and coatings (R4, tab 311 at 947). In addition, the description of the metal roof system included requirements for Hydrostatic Head Resistance (ASTM E2140), Wind Loads (FM 4471), and Wind Uplift Resistance (ASTM E1592 and UL 580) (R4, tab 311 at 947). Section 1.2.1.2 addressed wind uplift resistance and recognizes that "[u]plift force due to wind action governs the design for panels," and that Meltech will "[s]ubmit wind uplift test report prior to commencing installation" (R4, tab 311 at 947).

13. Section 2.1, Roof Panels, stated that Meltech would install metal roof panels with a thickness of 22-gauge and adhered to certain ASTM standards, including abrasion, flame spread, flexibility, hardness, and impact (JSOF ¶ 4; R4, tabs 21 at 1; 311 at 955-56). Included in the submittal were calculations for roof wind loads and uplift resistance of roof assemblies (R4, tab 311 at 79-89).

14. Section 1.9, Conformance and Compatibility, provided that the "entire metal roofing and flashing system must be in accordance with specified and indicated requirements, including wind resistance requirements." Section 1.9 provided that deviations shall meet the specified requirements and that deviations shall be approved by the CO "prior to installation" (R4, tab 311 at 954).

15. The administrative contracting officer (ACO) approved Meltech's 100% Design Specifications on April 7, 2016. The 22-gauge roof panels were approved to meet the safety standards as outlined in the Design Criteria. USACE's acceptance stated that the "Government acceptance of this design package does not relieve Meltech Corp., Inc. from the responsibility of any design errors or omissions. Any revisions to the 100% Exterior Submittal Package drawings and specifications shall be reviewed and approved by the Designer of Record and submitted to the Government for concurrence." (JSOF ¶ 4; R4, tab 21)

16. Seven months after the 100% Design Specifications were approved, Meltech informed USACE that it intended to switch to 24-gauge panels, which are thinner than 22-gauge panels (JSOF ¶ 5; R4, tab 292 at 1, 5).

17.  In the following months, Meltech provided additional support and calculations that the thinner 24-gauge metal panels would satisfy wind uplift resistance and design load requirements.  On February 8, 2017, the designer of record (URS) marked it "APPROVED AS NOTED" and commented that the 24-gauge metal panel data provided showed conformance to the requirements of ASTM E1592 and UL 580. (R4, tab 292 at 6)

18.  On February 16, 2017, USACE rejected the proposed substitution of 24-gauge panels for 22-gauge panels, by E-coding the Transmittal stating that "[t]he Government understand[s] that this submittal meets the wind uplift requirement but does not meet specification metal thickness for 22 gage [sic]" (JSOF ¶ 6; R4, tab 293).

19.  On February 21, 2017, Barry Boyd (Meltech's Senior Project Manager) responded via email and stated that the issue could not be covered through email, requested a meeting that week, but stated that Meltech "intend[s] to start installing the roofing tomorrow" (R4, tab 294 at 1).

20.  The parties continued to discuss the issue with the ACO stating in a February 23, 2017 email that "It was brought up to my attention that Meltech had chosen to ignore a government directive in regard to the installation of a roof decking material.  I spoke to Barry Boyd and he still maintains his position of installing a disapproved material."  (R4, tab 296 at 1)  The ACO had already cautioned Meltech on February 21, 2017 that "[y]ou can ONLY install the material that was approved by the government on the 100% design" (R4, tab 294 at 1).

21.  The ACO stated in a February 23, 2017 letter to Meltech concerning the "Notification of Deviation from the Accepted Design for Metal Roof Panels":

> This letter shall serve as notice that the installation of the 24 gauge steel sheet panels that were delivered to the project site on February 16, 2017 is considered a deviation from the Government reviewed and accepted design. These 24 gauge steel sheet panels shall not be installed and are not acceptable for use for this project.
>
> Per Specification Section 07 41 13, Metal Roof Panels, Paragraph 2.1.1, Steel Sheet Panels, Meltech was notified that 22 guage [sic] steel sheet panels are required for the Metal Roof Panels.  This specification section was also included in the approved exterior design that was accepted by the Government on April 7, 2016 via serial letter C-0026.

5

Per Specification Section 01 12 00, Design after Award, paragraph 1.3 a, Meltech was also notified that approval from the Designer of Record and the Government must be obtained for any proposed revision to the Government reviewed and accepted design. The Government has not concurred with the use of the 24 gauge steel sheet panels.

Installing material that deviates from the Government reviewed and accepted design is unacceptable. Meltech is responsible to ensure that the materials reflected in the approved design are provided and installed. The Government will not accept or authorize any material for use on this project that deviates from the approved design.

Providing the incorrect 24 gauge steel sheet panels for the metal roof deck has put the project schedule at risk for impacting critical roofing activities. Meltech must provide correcting action immediately, to include providing the correct 22 gauge steel sheet panels included in Specification Section 07 41 13, Metal Roof Panels, Paragraph 2.1.1 of the approved design and recovering any delays resulting from Meltech providing the incorrect 24 gauge steel sheet panels.

(R4, tab 295 at 1) The ACO followed her formal direction with an email to Mr. Steve Krishack, General Operations Manager, alerting him that in contravention of the specific direction not to install the 24-gauge steel sheet panels, Mr. Boyd advised the government of his intention to install the disapproved material. The ACO recapped the timeline and its impact on the schedule, reminding Meltech "[t]he submittal for the material which required Government Approval as it deviated from the 100% design was submitted for government 'approval' on 9 Feb and the government rejected on 16 Feb. Please note that the Government has 30 days to review any submittal requiring government approval." The ACO went on to caution Meltech of the impact for failure to follow the contract. (R4, tab 296)

22. On February 24, 2017, Mr. Krischak emailed the ACO and apologized for Mr. Boyd's "upsetting" behavior and "argumentative" approach with USACE's staff. He told USACE that the 24-gauge panels Meltech had procured would meet the project performance criteria and therefore satisfy the RFP requirements. He stated that Meltech was going to "proceed (at our own risk) with the . . . roof install activity and will immediately resubmit the complete 24-gauge Roofing Submittal package." (R4,

6

tab 297 at 1)  Meltech also provided a submittal from the designer of record supporting the change to 24-gauge panels (JSOF ¶ 7; R4, tab 297 at 1; app. supp. R4, tab 849 at 6).  In its approval, URS commented that it "has reviewed this SSM roof wind uplift resistance submittal to verify that the base building information shown on the shop drawings and the design load requirements shown in the calculations are in general conformance with the contract documents prepared by URS" (app. supp. R4, tab 849 at 6).

23.  Meltech and USACE met on March 2, 2017, to further discuss the use of 24-gauge panels (R4, tab 300 at 5).  On March 28, 2017, Meltech provided an additional submittal from an independent tester, addressing the government's concerns with  "oil canning" and the warranty for a "weathertight" roofing system (JSOF ¶ 8; R4, tab 300 at 5-6).  The independent tester stated that the 24-gauge "[o]il canning is an aesthetic characteristic of light gauge sheet metal roofing and flashing materials and not a flaw and therefore not a cause for rejection or performance of the material as intended."  The independent tester concluded that the 24-gauge metal panel would not affect the "20 year NDL weathertight roofing system warranty . . . ."  (JSOF ¶¶ 7-8; R4, tab 300 at 5-6)

24.  Although Meltech had yet to receive approval for the 24-guage metal panels, it proceeded to install them on March 6, 2017, and was completed by April 5, 2017 (R4, tab 29 at 1513, 1523, 1528, 1555, 1562, 1567, 1577, 1582, 1589, 1599, 1604, 1615, 1620, 1625).

25.  After the panels were installed and following review of Meltech's March 28, 2017 submittal update on the efficacy of the 24-gauge panels, on April 18, 2017, USACE acquiesced to Meltech's request to switch from 22-gauge panels to 24-gauge panels.  The government approved the 22-gauge roof panels proposed by Meltech with several qualifications, including: specific placement of fasteners' (18-gauge); minimizing "oil canning"; a 20 year warranty per IFC Specification Section 07 41 13, Para 1.8.1; the whole assembly must meet wind lift requirement as shown in submittal; no high bead stiffeners shall be shown in the metal roof panels per DPW & DOR; a minimum of 3 roof inspections; the purchased 24-gauge metal panels shall be compliant with Florida Building Code 2014; and, all deficiencies per 3rd party inspector and the government shall be fixed to the government's satisfaction.   (JSOF ¶¶ 8, 9, 11; R4, tabs 299, 300 at 3, 23; app. supp. R4, tab 851).

26.  USACE indicated that it considered the substitution of the 22-gauge metal panels for 24-gauge to be a change to the contract for which it could assess a credit against the contract price (JSOF ¶ 10; R4, tabs 299, 301).

27.  USACE consulted RSMeans data to calculate the difference in price for the proposed substitution from 22-gauge to 24-gauge metal panels, and concluded that this

material substitution would result in a credit to the overall contract price. USACE calculated a $19,873 credit. (JSOF ¶¶ 12-14; R4, tab 303 at 4)

28. Meltech notified USACE that it opposed the proposed credit on August 30, 2017 (JSOF ¶ 16). USACE took a credit of $19,873 in unilateral Modification No. R00007 dated April 13, 2018, for the difference between 22-gauge and 24-gauge metal roof panels (JSOF ¶ 17; R4, tab 306).

*Meltech's Claim*

29. Prior to the issuance of the unilateral modification, Meltech submitted a certified claim related to the metal roof credit on January 23, 2018 (R4, tab 305).

30. USACE did not issue a COFD in response to the claim, and Meltech filed a timely Notice of Appeal from a deemed denial of that claim.

DECISION

*The Parties' Contentions*

The government argues that after the CO approved the 100% Design Specifications, Meltech informed USACE that it intended to use 24-gauge panels, which are thinner than the 22-gauge panels identified in the specifications (gov't br. at 75). USACE argues that after the CO approved and finalized the 100% Design Specification, Meltech acted as if the design phase was an open-ended or ongoing process (gov't br. at 74). USACE contends that it properly deducted the value of the substituted panels (gov't br. at 79-80).

Appellant argues that the government is not entitled to a credit for the installation of 24-gauge metal roof panels, given that the panels met the RFP's performance criteria. USACE's Resident Engineer testified that Meltech's 24-gauge roof design met all wind uplift requirements and did not otherwise constitute a change to the RFP. Appellant avers that the 24-gauge panels did not deviate from the contract requirements and thus did not require a modification of the contract. (app. br. at 91-92) Appellant argues that USACE has breached the contract by demanding a higher level of quality for these items and unilaterally taking credits after agreeing that the work as installed meets the performance requirements of the project (app. resp. br. at 44). Only entitlement is before the Board.

*Metal Roof Gauge Credit Discussion*

The government bears the burden of establishing that the contract required the work upon which it seeks a credit and that it is "entitled to an equitable adjustment for

8

a deductive change to reflect the cost savings to the contractor." *C.H. Hyperbarics, Inc.*, ASBCA No. 49375 *et al.*, 04-1 BCA ¶ 32,568 at 161,150; *Nager Elec. Co. v. United States*, 442 F.2d 936, 946 (Ct. Cl. 1971); *Fru-Con Const. Corp.*, ASBCA Nos. 53544, 53794, 05-1 BCA ¶ 32,936 at 163,165. An equitable adjustment is not to be used to reduce or increase a contractor's profit or loss or to convert a loss to a profit or vice versa, for reasons unrelated to a change. *Pac. Architects and Eng'rs Inc. v. United States*, 491 F.2d 734, 739 (Ct. Cl. 1974).

Whether the specifications in the instant action were design or performance specifications is critically important for an understanding of the parties' respective rights and obligations. *See Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed. Cir. 1993); *PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 795-96 (2000). There is little doubt that the Design Criteria's description of the new roof was a performance specification. It is well-established that:

> Performance specifications specify the results to be obtained or the objective or standard to be achieved, and leave it to the contractor to determine how to achieve that objective, standard or those results, while design specifications explicitly state how the contract is to be performed and permit no deviations. . . . Specifications that state the operational characteristics desired of a product without establishing strict design requirements that must be followed exactly are considered to be performance rather than design specifications.

*MCSD Constr. Co., Inc.*, ASBCA Nos. 37226, 37239, 91-2 BCA ¶ 23,986 at 120,045; *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987). The Design Criteria listed the characteristics the new gable roof must meet, but left to Meltech the particulars of materials, panel thickness, and dimensions (finding 8). The Design Criteria cited significant structural engineering criteria that the contractor was to interpret in conjunction with the cited building standards to design a gabled roof system containing panels, including the thickness of the panels, and to achieve certain structural and safety considerations (findings 6-8). The contractor was to perform computer analysis and calculations to document the roof's structural design to withstand wind and live loads (finding 7). As the Design Criteria specified the new gable roof results to be obtained and left it to Meltech to determine how to achieve those results, they were performance specifications. *See Strand Hunt Constr., Inc.*, ASBCA Nos. 55671, 55813, 08-2 BCA ¶ 33,868 at 167,642 (The RFP specifications relating to the windows at issue were performance specifications; they listed 14 characteristics the windows must meet, but left to the contractor such particulars as location, size, manufacturer, and installation method.). Accordingly, Meltech assumed responsibility for the design of the roof, including the thickness of the metal panels – it

9

chose to use 22-gauge metal panels in its design. *See PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 795-96 (2000).

Meltech prepared its bid and price estimate for the new gable roof system to include a thickness of 22-gauge metal (finding 11). Later, after the contract award, Meltech finalized its design, specifying that a 22-gauge panel would be used to construct the gable roof, which adhered to ASTM standards for abrasion, flame spread, flexibility, hardness, and impact (finding 13). Meltech's Design Complete (100%) submittal again specified that a 22-gauge panel would be used to construct the gable roof, and stated that "[u]plift force due to wind action governs the design for panels" (Wind Uplift Resistance (ASTM E1592 and UL 580), and the requirements for Hydrostatic Head Resistance (ASTM E2140) and Wind Loads (FM 4471) were also considered in designing the roof system (finding 12). Included in its final design submittal were calculations for roof wind loads and uplift resistance of roof assemblies, stating that it would "[s]ubmit wind uplift test report prior to commencing installation" (findings 12, 13). On April 4, 2016, the government approved the 100% Design Specifications that included the 22-gauge metal panel for the roof system (finding 15).

After the 100% Design Specifications were approved, Meltech decided to change course and switched to a thinner 24-gauge metal panel for the roof system (finding 16). The noncompliant material arrived at the site on February 16, 2017; the same day the government rejected Meltech's submittal (findings 18, 21). Despite Meltech's insistence that the 24-gauge metal panels would perform as well as the 22-gauge, under the terms of this Contract Meltech is not entitled to install materials that vary from the specification based upon its own judgment. *See Valenzuela Eng'g, Inc.*, ASBCA Nos. 53608, 53936, 04-1 BCA ¶ 32,517 at 160,853 (quoting *Jacob & Youngs v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921)) ("'There is no general license to install whatever, in the builder's judgment, may be regarded as "just as good."' . . . and we conclude it should not be permitted here, where public safety is at issue.").

While the USACE did ultimately approve Meltech's alternative, thinner-gauged roof panels, the great weight of the evidence demonstrates approval came only after careful consideration of supporting documentation, engineering calculations, warranty verification and Meltech's vehement insistence (findings 17-18, 21-25). The USACE approved the change to the thinner material with several conditions, from the fastener placement to the wind lift requirements, to the increase in the number of roof inspections (finding 25). The government's concerns were obvious from its extensive list of conditions. In this situation, it was appropriate for the government to pump the brakes on Meltech's insistence to proceed without the government's approval to deviate from the approved 100% Design Specifications, which called for 22-gauge metal roof panels (findings 10-11, 14). The government had many questions and concerns over this major change to the roof system (findings 18, 20-21, 23). And

understandably so. The contractor bears the burden of proving that an "or equal" product is equal in quality and performance. *United Pac. Ins. Co.*, ASBCA No. 52419 *et al.*, 04-1 BCA ¶ 32,494 at 160,744; *N. Am. Constr. Corp.*, ASBCA No. 47941, 96-2 BCA ¶ 28,496 at 142,299 ("When a contractor bids the contract in anticipation of the Government's approval of a less expensive substitute, it assumes the risk that its substitute will not be found to be an 'equal' to the one called for in the contract."). But, while Meltech maintained that the 24-gauge panels would meet the project performance criteria, there is no dispute that the 24-gauge material is thinner than the 22-gauge material (finding 16). The contractor must satisfy the government that this lesser material meets all the requirements of the contract, including that it will not affect the warranty of the contractor-designed, government-approved roof system.

It is at this point that communication between Meltech and USACE broke down regarding the change in thickness of the metal roof panels. Meltech's Senior Project Manager's temper flared during meetings with USACE, and he was so adamant in his position that he stated Meltech would proceed to install the non-approved thinner gauge metal panels without government approval (findings 19-20, 22). Although Senior Meltech Executives tried to calm the waters, they too stated that Meltech was proceeding (at their own risk) to install non-conforming panels (finding 22). Meltech's insistence on proceeding to install a roof system that deviated from the approved design conflicted with the Design Criteria's clauses addressing such situations (finding 10). Meltech's proposed deviation from the approved 100% Design Specification and its intention to install a thinner metal roofing panel raised significant questions about the overall design of the roof system, as well as maintenance and warranty issues (finding 23). We find that the government was reasonable in its exercise of caution and request for additional analysis and supporting documentation on the feasibility and warranty of the roof system with the thinner gauge panel. *See Valenzuela Eng'g, Inc.*, 04-1 BCA ¶ 32,517 at 160,853.

Changes to the approved design required approval from the Designer of Record and concurrence from the government (finding 10; *see also* findings 14-15). As the design/build contractor of the project, Meltech was responsible for any defects in the roof design as outlined in its design specifications. The design of a major building component, such as the roof, must adhere to certain building code requirements and the submission of supporting data and calculations. This is for the structural integrity of the building, the safety of the building's personnel, as well as concerns for warranties and future maintenance. (*See also* findings 6-7, 12, 14). Thus, major structural changes are not taken lightly, and the DOR and the government must weigh significant structural and engineering considerations. The contractor is bound to their 100% Approved Design Specification[3] of the gable roof. It would not be prudent to

---

[3] This situation differs considerably from the circumstances involved in *Meltech Corp., Inc.*, ASBCA No. 61766 *et al.*, 25-1 BCA ¶ 38,862 at 189,128. In that

allow a contractor to continually change the approved 100% Design Specifications, at its will, when it chooses. *See* (finding 10); *Lovering-Johnson, Inc.*, ASBCA No. 53902, 06-1 BCA ¶ 33,126 at 164,173 ("It could not offer features and later provide lesser quality alternatives without identifying the variations and generally offering them at a reduced cost to the [government]. Absent precise proof concerning the alleged 'performance specification' that the government did not permit it to vary, [the contractor] was required to build what it proposed."); *Hunt Bldg. Corp.*, ASBCA No. 20678, 77-1 BCA ¶ 12,356 at 59,800 (In the contractor's 100% design submittal, it mistakenly included a more robust material that exceeded the contract's requirements; the Board held that the contractor's obligation "attached upon approval of the Schedule 'H' documents" and the contractor would be held to its mistake.), *aff'd on recon.*, 77-2 BCA ¶ 12,550; *ECC Int'l, LLC*, ASBCA No. 58875, 20-1 BCA ¶ 37,683 at 182,962 ("The [contract] required the contractor to ensure and verify to the government that its design was in strict conformance with its requirements, and provide sufficient detail to allow a ready determination by the CO of compliance or deviation."); *Sauer, Inc.*, ASBCA No. 61847, 21-1 BCA ¶ 37,939 at 184,263 ("We find that although the initial design document allowed for the use of PVC for above ground waste piping, [the contractor] was to perform work on the project in accordance with the solicitation, [the contractor's] proposals, and the final design and these documents all required [the contractor] to utilize cast iron for the above ground waste piping systems."); *Swinerton Builders Nw.*, ASBCA No. 57329, 17-1 BCA ¶ 36,738 at 179,017. The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs. *See Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014); *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1384 (Fed. Cir. 1999) (observing that, under a fixed price contract, "[t]he risk of loss for misjudging what it takes to perform . . . is on the contractor, not the Government"); *see also* 48 C.F.R. § 16.202–1 (placing upon the contractor "maximum risk and full responsibility for all costs and resulting profit or loss"). There is no persuasive evidence that the USACE's engineering review comments, initial disapprovals, or itemization of problems after the approved 100% Design Specifications lacked merit, were unwarranted, or caused Meltech unnecessary extra work. *Compare ECC Int'l Constructors, LLC*, ASBCA No. 59586, 25-1 BCA ¶ 38,812 at 188,783 (Delays were attributable to the government as the contractor incorporated the government's comments in response to the 95% design into its 100% design submission; the contractor was entitled to the approval of that design.).

---

claim, the RFP called for laminate, which the contractor bid at, but later during the design phase mistakenly incorporated a product exceeding the specification's minimum requirement. The government failed to carry its burden that the contractor purposely submitted in its 100% Design submittal with finishing materials that exceeded the RFP's minimal standards and failed to establish that it was entitled to a credit for any cost savings to the contractor. In that case, it was clear that there were no cost savings to Meltech.

Meltech has not cited any caselaw or identified any clause within the contract/Design Criteria that would shift the risk of such costs associated with its desire to amend the final approved design to the government. Accordingly, the government is entitled to a credit for the change in the metal roof panels from 22-gauge to 24-gauge.

<u>CONCLUSION</u>

For the foregoing reasons, the appeal is denied.


Dated: February 6, 2026

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals


I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61871, Appeal of Meltech Corporation, Inc., rendered in conformance with the Board's Charter.

Dated: February 6, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals